UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT 3:17mJ500-JGM

STATE OF CONNECTICUT     FILED
                                          March 29, 2017           FILED
         2017 MAR 29 PM 12:54                                 2017 APR 6 PM 4 12
COUNTY OF NEW HAVEN                   :    FILED UNDER SEAL
                                                              U.S. DISTRICT COURT
                                                              NEW HAVEN, CT.

## AFFIDAVIT OF ROBERT McKIERNAN

I, Robert McKiernan, being duly sworn, depose and state the following:

1.  I am a Task Force Officer with the Federal Bureau of Investigation ("FBI") in the Bridgeport, Connecticut Resident Agents Office and was duly sworn as a Deputy United States Marshal on December 10, 2012. I have been a duly sworn police officer with the Greenwich Police Department since April of 1997, after earning a Bachelor of Science Degree in Justice and Law Administration from Western Connecticut State University. I am a graduate of the Fairfield County Detective's School and have held the rank of Police Detective since March 31, 2008. I have attended numerous training programs and courses at the Connecticut Municipal Police Academy and at other facilities in the region. I have received specialized training in the analysis of financial records and the investigation of various types of criminal violations, including fraud offenses. During my employment as a Greenwich Police Officer and Detective, and as an FBI Task Force Officer, I have initiated and/or participated in hundreds of criminal investigations and initiated and/or participated in the arrest of hundreds of defendants.

2.  I submit this affidavit in support of a criminal complaint and arrest warrant for Thomas MURTHA ("MURTHA"), for violations of Title 18, United States Code, Section 1343 (Wire Fraud). Based on the facts set forth below in this affidavit, there is probable cause to believe, and I do believe, that MURTHA has violated the above-referenced criminal statute.

3. The information contained in this affidavit is based upon the investigation to date, which includes, but is not limited to, interviews of the victims described herein, subpoenaed grand jury records, official government records checks and public records checks, my training and experience as a criminal investigator, and my conversations with other law enforcement officers and/or members of the FBI. Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested criminal complaint and arrest warrant, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth herein only those facts I believe are necessary to establish probable cause to support the criminal complaint and arrest warrant requested herein.

## BACKGROUND AND INVESTIGATION TO DATE

4. This affidavit is being submitted as part of an ongoing investigation of wire fraud in Connecticut and elsewhere. As described further herein, from approximately August 2015 to the present, MURTHA engaged in a scheme and artifice to defraud individual victims by falsely representing to them that he would invest their funds and/or conduct real estate transactions for them and remit funds to the appropriate party when, as he well knew, he intended to use the money for other expenses, including payment for personal expenditures.

5. According to a report of the Connecticut Office of Chief Disciplinary Counsel, MURTHA was admitted to the bar of the State of Connecticut on May 19, 1981. During the time period relevant to this investigation, MURTHA operated a law practice under the name Maher & Murtha LLC in Bridgeport, Connecticut. In September 2016, MURTHA resigned from the bar after three grievance complaints had been filed against him.

6. During the course of his scheme and as described more thoroughly herein, MURTHA fraudulently obtained and/or fraudulently converted over $900,000 from five victims. As discussed in greater detail below, MURTHA made materially false statements to induce a victim to invest over $600,000, purportedly for real estate investments. MURTHA was also retained to handle real estate transactions on behalf of other victims; MURTHA embezzled funds from those victims instead of remitting funds to the appropriate parties. When confronted about missing funds, MURTHA sent emails to victims and/or their attorneys; the emails were designed to delay action on part of the victims, and also contained material misrepresentations.

7. The Connecticut Practice Book regulates certain conduct of attorneys who practice within the State of Connecticut. Included in those provisions are requirements related to the handling of monies received from clients and third parties. The Practice Book requires that "[a] lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account . . . [and] [c]omplete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of seven years . . . ." Practice Book, Rules of Professional Conduct, Rule 1.15(b). An account used to hold such funds is often referred to as an attorney's "IOLTA" account, and is an interest-bearing or dividend-bearing account established at certain eligible financial institutions. Interest accrued in these accounts is directed to legal services to help the poor and needy. An IOLTA account can only include client or third party funds, and may not hold the personal funds of any attorney, except funds to pay for bank service charges or obtaining a waiver of fees and service charges for the account. Practice Book, Rules of Professional Conduct, Rule 1.15(a)(5) and (c). Funds handled by an attorney as a

fiduciary must be maintained separate and apart from the attorney's personal funds, and monies handled by an attorney as a fiduciary may not be used for any unauthorized purpose. Practice Book § 2-27(a).

8. During the time period relevant to this investigation, MURTHA used several bank accounts at TD Bank, including at least two accounts designated as "IOLTA" accounts. Three accounts are relevant for the scheme described herein: TD Bank Account with number ending 4008 entitled Maher & Murtha LLC Attorneys at Law IOLTA Trust Account, Litigation Account ("IOLTA Litigation Account # 4008"); TD Bank account with number ending 5820 entitled Maher & Murtha LLC IOLTA Attorneys at Law, Real Estate Trustee Acct ("IOLTA Real Estate Account # 5820"); and Thomas M. Murtha, Esquire TD Bank account with number ending 6062 ("MURTHA's personal account # 6062").

**Victims #1, #2 and #3**

9. Victim #1 and Victim #2 (Victim #1's sister) and their deceased cousin's estate (Victim #3) were joint owners of a three-family house located in Shelton, Connecticut ("Shelton home"). Victim #1 and Victim #2 are co-fiduciaries of their deceased cousin's estate (Victim #3). The Shelton home had a lien on it from a nursing home which had provided care to the deceased cousin. Victim #1 and Victim #2 retained MURTHA to handle the sale of the house and their cousin's estate.

10. The Shelton home was sold, with the closing taking place on August 3, 2016. The sale price was $225,000. After deducting closing costs, the buyer's attorney paid MURTHA with a cashier's check in the amount of $204,704.52. The check was deposited into Maher & Murtha LLC's IOLTA Litigation Account # 4008. JM

4

11. MURTHA paid the Town of Shelton (checks in the amounts of $562.50 and $4,394.07), paid real estate tax in the amount of $5,625.00 in connection with the sale, and paid $7,875 to Coldwell Banker, and but never gave Victim #1 or Victim #2 their shares of the proceeds. MURTHA also failed to pay the nursing home from Victim #3's share; the nursing home maintained its lien on the Shelton home.

12. Before the check in the amount of $204,704.52 was deposited to the IOLTA Litigation Account #4008, the account had a negative balance. The day after the check was deposited, a wire transfer of $150,000 was made from the IOLTA Litigation Account #4008 to a law firm, Goldstein & Peck, for money owed to Victim #4 (as discussed below).

13. In October 2016, MURTHA exchanged emails with Victim #1. In an email on October 16, 2016, Victim #1 asked, "would you be willing to tell me if the trustee account with the house sale money still exists?" MURTHA replied by email on that date, "Account still exist." In another email, Victim #1 asked, "is the 200,000 plus in it?" MURTHA answered by email on October 16, 2016, "Yes". Notwithstanding MURTHA's representation, the funds from the sale of the house had been spent.

### Victim #4

14. Victim #4, who has a prior conviction related to embezzlement of funds, was arrested on October 5, 2012 on state charges for embezzling approximately $1.4 million from a former employer. The employer also filed a civil suit and a lis pendens on Victim #4's home in Bridgeport, Connecticut to recover some of the loss.

15. Victim #4 agreed to obtain a mortgage loan on his residence and to pay $250,000 to the employer's insurance company as partial restitution for the embezzlement. Victim #4

retained MURTHA to handle the mortgage refinance. The closing took place on August 4, 2015. In his capacity as Victim #4's attorney, MURTHA received a wire transfer in the amount of $271,319.03 from the UBS Warburg Real Estate Securities, the mortgage lender. The funds were deposited into MURTHA's IOLTA Real Estate Account # 5820.

16. On or about August 4, 2015, several checks were written from IOLTA Real Estate Account # 5820 to pay recording costs, title insurance, MURTHA's attorney fee and various other closing costs. However, neither Victim #4 nor the employer's insurance company received any of the money due and owing to them.

17. On or about July 13, 2016, a wire from account IOLTA Litigation Account # 4008 was made to counsel for Victim #4 in the amount of $11,832.61. On August 4, 2016, MURTHA wired or caused to be wired $150,000 to Victim #4's attorney from MURTHA's IOLTA Litigation account # 4008.

18. Shortly thereafter, MURTHA and an attorney for Victim #4 exchanged emails concerning the $100,000 that MURTHA still owed to Victim #4. For example, on August 9, 2016, counsel for Victim #4 and MURTHA had the following email exchange:

| | |
|---|---|
| VICTIM #4 ATTORNEY: | 9:00 am Tuesday. Still have not received the wire for the $ 100K. |
| VICTIM #4 ATTORNEY: | 11:30 am. Still no wire.<br>Tom: **Please have your bank manager or whomever else initiated the wire call me directly. Failing to hear from such a person, I do not think I have any alternative to filing a grievance against you for mishandling my client's funds.** |
| MURTHA: | I will call them now |
| VICTIM #4 ATTORNEY: | Have them call ME now |

| | |
|---|---|
| VICTIM #4 ATTORNEY: | I am still waiting for a call from a representative of your bank to confirm that they have wired the $100K to my trustee account. If you refuse to have them call me I will assume that you were lying to me when you told me that the funds were wired to my IOLTA account last week. |
| MURTHA: | Not lying to you just trying to get wire in your account today |
| VICTIM #4 ATTORNEY: | 4:30 pm. Still no wire. |

19. Similar exchanges took place on later dates. On August 16, 2016, MURTHA sent an email to Victim #4's attorney: "No wire I assume. Will cancel and drop off bank check as promised". Despite this assurance, as of March 24, 2017, no portion of the $100,000 had been received by Victim #4 or Victim #4's attorney.

20. In or about August 2016, an attorney representing Victim #4 filed a civil suit in an attempt to recover the remaining mortgage proceeds from MURTHA. That case remains pending.

### Victim #5[1]

21. Victim #5 hired MURTHA years ago for some minor legal matters and the two became friends. In 2015, MURTHA asked Victim #5 if Victim #5 was interested in being a 50/50 partner with MURTHA buying four houses in Newtown, Connecticut. MURTHA told Victim #5 that he would use his real estate connections to buy the properties before they came on the market, make renovations and improvements, and then resell them and split the profit with Victim #5. It was important to Victim #5 that the properties were in Newtown, Connecticut



7

because Victim #5's investments would be in the same town where Victim #5 lived and Victim #5 liked the area.

22.     MURTHA showed Victim #5 cell phone pictures of the four Newtown properties that he was proposing to buy. Victim #5 believed that MURTHA was also going to contribute an equal amount of cash from his personal funds. MURTHA represented to Victim #5 that Victim #5 would make 5 to 10 percent on Victim #5's investment and if they lost money, MURTHA would make Victim #5 whole. Victim #5 and MURTHA had only an oral agreement.

23.     Victim #5 gave MURTHA three checks either from Victim #5 personally or from an LLC controlled by Victim #5: $260,000 on or about August 12, 2015 (deposited on or about August 13, 2015); $150,000 on or about August 26, 2015 (deposited on or about August 31, 2015); and $250,000 on or about October 20, 2015.

24.     MURTHA did not deposit those checks into an investment or business account representing the joint venture. Instead, the three checks were deposited into IOLTA Real Estate Account # 5820; funds were co-mingled with MURTHA's client funds.

25.     As other client funds were deposited into IOLTA Real Estate Account # 5820, it is difficult to determine where Victim #5's money was spent. In August 2015 (after Victim #5's $260,000 check had been deposited), $210,501.72 was spent from IOLTA Real Estate Account # 5820 for the purchase of the 18 Head of Meadow property discussed below, but there was other money in the IOLTA Real Estate Account # 5820 which could have covered the purchase. As of December 16, 2015, the balance in IOLTA Real Estate Account # 5820 was down to $4,579.36.

26.     Victim #5 sought the advice of another attorney (now deceased). The attorney drafted a letter dated December 2, 2015 for Victim #5 to send to MURTHA asking MURTHA to *JM*

8

provide details concerning the investments. According to Victim #5's current attorney, MURTHA returned the document in March 2016, after much prompting, with information written in. According to the document, MURTHA had contributed $883,843 compared to Victim #5's $660,000 and listed the street addresses of four investment properties: 18 Head of Meadow, 65 Taunton Lake Road, 885 Westwood Drive, and 107 Brushy Hill Road. The handwritten notations on the document indicated that the properties had been acquired between October 2015 and January 2016; there were also details of planned improvements for each. The information MURTHA input on the document concerning the purchases of the properties was false because, among other things, MURTHA did not expend $883,843 of his own money to buy those properties and the closings did not occur in the time periods indicated.

27. In fact, title searches revealed that MURTHA purchased two properties in Newtown after Victim #5's funds had been dissipated:

(1) 65 Taunton Lake Road: MURTHA purchased a property at 65 Taunton Lake Road on February 18, 2016 for $200,000 with two mortgages in the amounts of $65,000 and $135,000. No down-payment was made for the purchase of the 65 Taunton Lake Road property. MURTHA sold the property on October 27, 2016 for $247,000. The $47,000 from the sale was deposited to MURTHA's personal account # 6062.

(2) 107 Brushy Hill Road: MURTHA purchased 107 Brushy Hill Road on September 26, 2016 for $365,000 with a mortgage loan in the amount of $385,000. On October 27, 2016, MURTHA deeded the property to the mortgagee for $1.00.

28. MURTHA acquired an additional property at 18 Head of Meadow Road—likely using funds from Victim #5. Individual #1, who has been identified as MURTHA's *JM*

9

girlfriend/fiancé, purchased a property at 18 Head of Meadow Road on May 26, 2015 for $230,000, from an estate. Individual #1 immediately quitclaimed the property to MURTHA for $1.00. A check in the amount of $210,501.72 for the purchase of the property came from the IOLTA Real Estate Account # 5820 on August 13, 2015. Closing was delayed because an executor needed to be appointed for the estate. On or about June 8, 2016, MURTHA obtained a $110,000 mortgage. The proceeds from the mortgage were deposited into MURTHA's personal account # 6062. MURTHA sold the 18 Head of Meadow Road property on July 27, 2016 for $387,500. The buyer's deposit of $19,375 was paid to MURTHA on or about July 7, 2016 and was deposited into MURTHA's personal account # 6062. A cashier's check in the amount of $209,790.93 for what appears to be the balance from the sale was deposited into the IOLTA Litigation Account # 4008 on July 27, 2016.

29. As discussed below, the fourth property that MURTHA represented to Victim #5 that he purchased as an investment with Victim #5—885 Westwood Drive—was not in Newtown, Connecticut, but rather in Michigan. MURTHA never disclosed to Victim #5 that he would use Victim #5's money to purchase property out of state.

30. MURTHA did not return any of Victim #5's $660,000 investment; nor did MURTHA pay Victim #5 any of the proceeds from the sales of the 65 Taunton Lake Road or 18 Head of Meadow Road properties.

31. Victim #5's attorney, now deceased, had email communications with MURTHA in August and September 2016 concerning Victim #5's investments. On September 6, 2016, Victim #5's attorney sent an email to MURTHA advising that it did not appear that MURTHA had invested 50/50 with Victim #5 and advising MURTHA not to disburse any funds without

10

Victim #5's express consent. MURTHA responded by email, ". . . in court but I put 725 in Westwood. Plus Const cost. I put 151 in head o meadow and 60 in brushy hill I'll give all the number after court. That's a few".

32. Victim #5, who is represented by counsel, has filed a civil state court action against MURTHA, which appears to be pending.

### Purchase of 885 Westwood Drive, Birmingham, Michigan

33. In December 2015, MURTHA told Victim #5 that he needed another $100,000 to buy a $1.5 million commercial property in the Stony Hill section of Bethel, Connecticut. MURTHA said he already wired $100,000 and he needed Victim #5's $100,000 to purchase the property. MURTHA also informed Victim #5 that a buyer would purchase the property in four to six months to convert it to condominiums. On December 7, 2015, Victim #5 wired $100,000 as MURTHA instructed. The wire was from Victim #5's Bank of America account (which was held in Victim #5's name, with a Connecticut address) to Devon Title's account at PNC bank (which title company used a bank branch in Troy, Michigan).

34. While Victim #5 believed that the $100,000 was going to be used for the purchase of the property in Bethel, Connecticut, Victim #5's attorney (now deceased) learned that the $100,000 was wired to a title agency in Michigan in connection with the purchase of a property at 885 Westwood Drive, Birmingham, Michigan. 885 Westwood Drive was the fourth property that MURTHA listed as one of the investment properties on the form provided to Victim #5, but MURTHA had never indicated it was in Michigan.

35. While Victim #5's attorney attempted to stop the title agency from using Victim #5's money in connection with the Michigan purchase, the closing had already taken place. JM

MURTHA later reimbursed Victim #5 with a $100,000 check from MURTHA's personal account # 6062.

36. A title search revealed that 885 Westwood Drive was purchased by Thomas M. MURTHA on December 15, 2015 for $725,000 with a $616,000 mortgage from Landmiller Real Estate, LLC. On September 28, 2016, MURTHA quitclaimed the property for $1.00 to The Irrevocable Trust for the Benefit of Individual #1's Children. Individual #1 and her children are living at that address.

37. A review of MURTHA's bank accounts shows that a number of payments appear to relate to the 885 Westwood Drive property. The identified payments are listed below. Certain payments make reference to the Westwood Drive property in the memo line. Other payments do not, but in the case of payments to Landmiller Real Estate, payment amounts are consistent with checks that reference the Westwood Drive property in the memo line. Two payments to Landmiller Real Estate have a reference to MURTHA's Newtown residence in the memo line. The affiant understands that a $616,000 mortgage was also put on the Newtown residence; the affiant believes this was to secure the $616,000 mortgage on the 885 Westwood Drive property. Payments are listed below:

| Date | Amount | Account # | check # | Payee |
|---|---|---|---|---|
| 11/18/2015 | 35,000.00 | 5820 | wire | Coldwell Banker |
| 12/4/2015 | 870.00 | 6062 | 3114 | Devon Title |
| 12/18/2015 | 100,000.00 | 6062 | 3136 | Victim #5 (repayment) |
| 1/6/2015[2] | 2,244.84 | 6062 | 3150 | Glenda Meads Architects |

---

[2] This payment came out of the account in January 2016; the check date was likely input in error.

| Date | Amount | Account | Check # | Payee |
|---|---|---|---|---|
| 1/6/2016 | 5,133.33 | 6062 | 3155 | Landmiller Real Estate |
| 1/23/2016 | 2,529.00 | 6062 | 3172 | Zilka Heating & Cooling |
| 1/23/2016 | 150.00 | 6062 | 3174 | Empire Today LLC |
| 2/7/2016 | 5,133.32 | 6062 | 3200 | Landmiller Real Estate |
| 3/8/2016 | 5,133.33 | 6062 | 3248 | Landmiller Real Estate |
| 3/28/2016[3] | 5,383.33 | 6062 | 3271 | Landmiller Real Estate |
| 4/11/2016 | 5,133.33 | 6062 | 3289 | Landmiller Real Estate |
| 4/26/2016 | 5,389.99 | 6062 | 3302 | Landmiller Real Estate |
| 5/10/2016 | 5,389.99 | 4008 | Teller CK | Landmiller LLC |
| 7/16/2016 | 5,389.99 | 6062 | 3368 | Landmiller Real Estate |
| 8/3/2016 | 5,389.99 | 6062 | 3402 | Landmiller Real Estate |

38. On or about December 10, 2015, $600,100 was sent via wire transfer from an account associated with Landmiller Real Estate (which company is located in Connecticut) at People's Bank to Devon Title's PNC Bank account. This wire transfer represents the mortgage on the Michigan property.

### MURTHA's personal account # 6062

39. MURTHA's personal account # 6062 was used to pay for restaurants, credit cards, utilities, travel, alimony payments and various personal expenses. As indicated above, checks were drawn on MURTHA's personal account # 6062 to make payments to Landmiller Real Estate in connection with the purchase of the Michigan property. Deposits to MURTHA's *JM*

---

[3] The memo line for this check indicates that it is a replacement plus $250.

personal account # 6062 consisted of checks from legal service plans, other attorneys, and checks or transfers from his client trust accounts. Some of the deposits from the IOLTA accounts are labeled "TMM Draw," while others have nothing in the memo section. From September 1, 2015 to July 5, 2016, $275,000 was transferred from IOLTA Litigation Account # 4008 and IOLTA Real Estate Account # 5820 to MURTHA's personal account # 6062.

40. Between June 2015 and September 2016, there were also more than fifty checks totaling over $80,000 to Individual #1 from MURTHA's personal account # 6062. Some of the checks had "payroll" listed in the memo section. Victim #5 stated that Individual #1 did not work for MURTHA. According to Victim #5, Individual #1 visited MURTHA on some weekends, but lived and worked in Michigan.

## CONCLUSION

41. Based upon information contained within this affidavit, I believe there is probable cause that MURTHA has violated Title 18, United States Code, Section 1343 (wire fraud). MURTHA caused at least one interstate wire to be transmitted in furtherance of the fraud. Accordingly, I respectfully request that the Court issue a warrant for the arrest of Thomas M. MURTHA.

42. Finally, in my judgment and based on my training and experience, the disclosure of this affidavit and its attachments at this time will jeopardize the government's ongoing investigation. Accordingly, it is requested that this affidavit, the arrest warrant, and complaint be sealed until further order of the Court.

_____
TASK FORCE OFFICER ROBERT McKIERNAN
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me this 29th day of March 2017, in New Haven, Connecticut.

/s/ Joan G. Margolis, USMJ
_____
JOAN G. MARGOLIS
UNITED STATES MAGISTRATE JUDGE

15